# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**In re:**

**JOHN GUNARTT**

**Debtor**

**Case No. 05-25498**

## DEBTOR'S OBJECTIONS TO THE FINAL REPORT
## AND FEE APPLICATIONS

**NOW COMES THE DEBTOR,** John Gunartt with his Objections to the Chapter 7 Trustee's Final Report and Fee Applications from the beginning and to now for the following reasons: The legal authority of the courts have been used to acquire illegitimate court orders which allowed various ones to benefit from their own wrong doings.  **See** unclean hands (Civ. Code 3517).

1.  The bankruptcy was caused when Old Kent/Fifth Third Bank "used unclean hands" and filed a wrongful foreclosure without default or notice of default # 02CH-21536.  **Exhibit-A** the mortgage modification without the borrower's knowledge or his signature which removed the 30 year fixed and added a balloon payment that was immediately due.  **Exhibit-B,** Alliance Funding 30 year fixed.  **Exhibit-C,** There was breach of construction contract that withheld substantial personal funds and never released, beginning in January 2001 through June 2006.  Cause of a voluntary chapter 11 bankruptcy by June 2005 and **converted to involuntary chapter 7 liquidation.  More than 12 creditors involved, none were delinquent.**

**See exhibit-D,** Old Kent/Fifth Third Bank's loan commitment dated September 20, 1999 which allows assignment of beneficiary interest if the property is in a land trust.  The bank used this predatory loan document to act at will with unclean hands to cause bankruptcy and take the property.

**See exhibit-E,** copy from the forensic audit of the mortgage modification from Consumer Mortgage Audit Center as follows: Any loan modification would require a signature of the borrower that changed the payment; amount borrowed or changes to any terms of the original contract.  The borrower's required signature does not appear on the new contract that was created.

KENNETH S. GARDNER, CLERK
PS REP. - NH

FILED
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
MAY 02 2011

<u>See The Equitable Origin of the Doctrine of Unclean Hands.</u> California has long recognized the maxim that "No one can take advantage of his own wrong" (Civ. Code 3517) Put another way, he who comes into equity must come with clean hands." (<u>See</u> Wilson v. S.L. Rey, Inc (1993) 17 Cal. App. 4th 234, 244, Kendall-Jackson Winery, Ltd v. Superior Court (1999) 76 Cal. App. 4th 970, 978). The unclean hands doctrine protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the courts, rather than the opposing parties' interest. The doctrine promotes justice by making a plaintiff answer for its own misconduct in the action. It prevents "a wrongdoer from enjoying the fruits of his transgression." [Citation omitted.] [At p.p. 978-970.]

<u>See The Basics of Unclean Hands.</u> Under the doctrine of unclean hands, "a plaintiff [must] act fairly in the matter for which he seeks a remedy. He must come into court with clean hands and keep them clean or he will be denied relief, regardless of the merits of his claim." (Kendall-Jackson Winery, Ltd. Supra 76 Cal. App. 4th at 979 [citations omitted.] The defense of unclean hands applies to legal as well as equitable actions. (Kendall-Jackson Winery, Ltd. v. Superior Court, supra, at p. 978). At least one recent case suggests the defense of unclean hands may be submitted to the jury. (Fuller-Austin Insulation Company v. Highlands Insurance Company (2006) 135 Cal. App. 4th 958, 974).

<u>See What Conduct Constitutes Unclean Hands.</u> A plaintiff's inequitable conduct in connection with the matter in controversy provides a complete defense to the plaintiff's action. (Dickson, Carlson & Campillo v. Pole (2000) 83 Cal. App. 4th 436, 446). Conduct is sufficient to constitute unclean hands if it "violates conscience or good faith or other equitable standards of conduct" (id). The doctrine of unclean hands also applies to bad faith conduct by the plaintiff in connection with the matter in controversy. (Fladeboe v. American Isuzu Motors, Inc. (2007) 150 Cal. App. 4th 42, 56). The defense is based upon misconduct in the particular transaction or connected with subject matter of the litigation. (Wilson v. S.L. Rey, Inc. supra, 17 Cal. App. 4th at 244).

Page 3 of 6

2. Fifth Third used unclean hands and the authority of the courts to obtain illegal court orders to take advantage of their own wrong. (Civ. Code 3517).

> See what is the effect of fraud upon the court? "Fraud upon the court" makes void the orders and judgments of that court. It is also clear and well-settled Illinois law that any attempt to commit "fraud upon the court" vitiates the entire proceeding. The People of the State of Illinois v. Fred E. Sterling, 357 Ill. 354; 192 N.E. 229 (1934) ("The maxim that fraud vitiates every transaction into which it enters applies to judgments as well as to contracts and other transactions."); Allen F. Moore v. Stanley F. Sievers, 336 Ill. 316; 168 N.E. 259 (1929) ("The maxim that fraud vitiates every transaction into which it enters..."); In re Village of Willowbrook, 37 Ill. App. 2d 393 (1962) ("it is axiomatic that fraud vitiates everything."); Dunham v. Dunham, 57 Ill. App. 475(1894), affirmed 162 Ill. 589 (1896); Skelly Oil Co. v. Universal Oil Products Co., 338 Ill. App. 79, 86 N.E. 2d 875, 883-4 (1949); Thomas Stasel v. The American Home Security Corporation, 362 Ill. 350; 199 N.E. 789 (1935).
>
> Under Illinois and Federal law, when any officer/lawyer of the court has committed "fraud upon the court" the orders and judgment of that court are void, of no legal force or effect.

**Below are a series of (unclean hand) actions used by Fifth Third Bank to cause bankruptcy of the debtor to benefit from their own wrongs:**

3. The borrower purchased and owned the 18 unit apt. building in April 2007. The licensed architect was hired for approx. $20,000.00 total cost, all taxes and liens were paid to receive a clear title. Building permits @ approx. $12,000.00 were acquired based on the licensed architects plans and specifications. Payment of vacant building insurance at approx. $12,000.00 per year from 1997 through December 2005. All property taxes paid from 1997 through part of year 2005. Due to a lack of initial funding and lack of receiving a bridge loan to complete gut rehab of the 18 unit apartment building with 18,000 sq. ft. plus. The scope of work for this project from the licensed architect was gut rehab at approx. $55.00 to $60.00 per sq. ft. this cost was well above the initial $506,000.00 loaned. The borrower had to make-up the difference for lack of funding to make the project work.

4. The borrower's prior experience was as a trade school trained HVAC technician and worked many years with piping, plumbing, heating and minor electrical work as a technician. Additional experience was prior ownership and management of multi-unit apartments including all maintenance and upkeep. His professional licenses are real estate broker and certified real estate appraiser. All quality rehab work was based on plans and specifications of a licensed architect and approved by each inspector. The borrower due to lack of funding signed the construction contract with Old Kent/Fifth Third Bank, became the unpaid project manager using his sweat equity. Daily performing security, maintenance and upkeep, paying all utilities. **By doing this, it substantially cut the contractors overhead costs to make the project feasible.** The borrower was required to first purchase all materials and supplies, he must hire and pay smaller subcontractors to complete each segment of the project and obtain release of liens from each source. A request would be made to the City of Chicago building inspectors for approval and sign-off on the permits. **Exhibit-F, OPPINDANusa,** The bank's compliance inspectors would have to inspect and approve each segment of the project. An approved report with release of lien from each would be presented to Fifth Third Bank for return of the borrower's personal funds through Chicago Title & Trust.

5. This type operation with approval continued from November 1999 through January 2001. That is when the first six units and three storefronts were complete with certificates of occupancy from the City's building department. In January 2001 it was also time for a final amount of $154,000.00 to be loaned to complete gut rehab of the second half of the 18 unit apartment building, requiring only inside work still to be completed. The major work was already completed, consisting of new porches, new tear-off roof, new tuck pointing & brick-work, new thermal windows, second new electrical service of 800 amps brought in, new plumbing rough-in and many other piping and heating rough-ins had been completed.

6. In January 2001 the borrower had the burden of still not in return of a good portion of personal funds that he had spent on rehab. The mortgage modification documents show only $292,610.00 of the $506,000.00 loaned had been used, allowing minimum funds of $154,000 to complete the project. The **mortgage modification was then created; this withheld all the borrower's personal funds from that point on creating the bankruptcy and not allowing completion of the project.**

7.  All interest payments from the borrowers personal funds on the principal of $506,000.00 had to be made each month from November 1999 through June 2002.  This amounted to approx. $3,000.00 per month x 30 months; none were ever late or missed.  The borrower paid each loan extension and appraisal fee from 1/10/01 through 6/10/02.  In November 2001 the borrower was then told he could go back to work at the project because the $154,000.00 for completion of the second half of the project had been approved.  The borrower went back to work and completed a substantial amount of additional work and spent a substantial amount of additional personal funds.  **Exhibit-G,** contractor's sworn statement in April 2002 a requested a draw of $69,700.00 for work and materials from the approved amount of $154,000.00 loaned to finish rehab of the 2nd building.  The same approval process was completed as previous.  After this was acquired the approved funds still were not released.  **Exhibit-H,** new Promissory Note.

**The borrower was misled into spending additional and substantial person funds thinking there would be release of $154,000.00 to complete the 2nd half of the project.  The borrower also had to spend substantial personal funds to defend against false court actions without a default or delinquency.** (Civ. Code 3517).

8.  The bank's false actions caused the borrower to spend approx. $40,000 to $50,000 on lawyers to defend against.  There were no missed payments, did not receive a notice of default with due process, violations of the Illinois Mortgage Foreclosure Law, 735 ILCS 5/15-1101 through 1706.  Violations Statute of Frauds involving real estate.

**The Borrower was forced into involuntary chapter 7 liquidation without "Primary Consumer Debt."  Was not allowed another form of bankruptcy with his plan to pay all creditors 100%.  None of the 12 creditors had a default, delinquency or required petition.**

9.  the most common consumer debts are home mortgages, credit card debts and personal loans.  The borrower did not have either.  **See** Wyman, A 707(b) Sampler, Norton Bankruptcy Law Adviser, Issue No. 5, page 2 (May 1994). Debt incurred for a business venture or with a profit motive is not a consumer debt.  Cypher Chiropractic Center v. Runski (In re Runski), 102 F. 3d 744, 747 (4th Cir. 1996). Debt that is owed for income taxes is not consumer debt.

Page 6 of 6

In re Westberry, 215 F. 3d 589, 591-94 (6th Cir. 2000). When reviewing for consumer debt, the trustee should consider all listed debt, secured and unsecured, not just debt to be discharged. Price v. U.S. Trustee (In re Price), 353 F. 3d 1135 (9th Cir. 2004).

The trustee should be aware that credit card debts may not in all instances constitute consumer debts. When the credit transaction involves a profit motive, it is outside the definition of a consumer transaction. Mortgage debt is considered a consumer debt, In re Kelly, 841 F. 2d 908, 915 (9th Cir. 1988), unless the proceeds are used for a business purpose. In re Funk, 146 B.R. 118 (D.N.J. 1992). The trustee should be alert to residential mortgage borrowing that is used to finance business operations or investments and therefore constitutes a non-consumer obligation with taxes due.

10.  All of the debtor's credit card debts of approx. $78,000.00 were lines of credit with Home Depot, Menards and others. This debt was used to rehab the commercial property; all use was with a profit motive and taxes due. All was non-consumer debt, no personal use.

11.  The debtor purchased his residence in June 1984 for cash, the property was refinanced and all the equity of approx. $178,000.00 was used to rehab the commercial property with a profit motive.

12.  False creditor charges against the borrower/debtor from the beginning have clogged the courts for years. If the charges were legitimate they would have cleared the courts within months.

**Conclusion:**  I ask this Honorable Court for all the reasons mentioned to not allow further payments from the estate of this ongoing bankruptcy, if not corrected I will also loose my home of 27 years. Enter an order that that will reverse or allow reversal of previous orders for a fair and just decision.

**By:** _John Gunartt_                    May 02, 2011
John Gunartt/Debtor
414 South Scoville Avenue
Oak Park, IL 60302
708 383-1288



9680/0181 27 001 Page 1 of 6
2001-03-09   12:03:32
Cook County Recorder   31.00

0010186921



3 1421/11

# MORTGAGE MODIFICATION AGREEMENT

**THIS AGREEMENT** made as of the 10th day of January, 2001, by and between Chicago Title Land Trust Company, a Corporation of Illinois, as Trustee under Trust Agreement dated April 17, 1997 and known as Trust #1103699, (whether one or more, and if more than one, jointly and severally) being hereinafter referred to as the "Mortgagor" and John Gunartt, whose address is 414 South Scoville, Oak Park, IL 60302, (whether one or more, and if more than one, jointly and severally) being hereinafter referred to as the "Borrower" and OLD KENT BANK, a Michigan Banking Corporation, maintaining its principal office at 105 South York Street, Elmhurst, Illinois 60126, said bank together with its successors and assigns, including each and every holder from time to time of the note (as hereinafter defined) being hereinafter referred to as the "Mortgagee".

## WITNESSETH

**WHEREAS,** the Mortgagee has heretofore loaned the Borrowers the principal sum of Five Hundred and Six Thousand and 00/100 Dollars ($506,000.00) which loan is evidenced by a promissory note being hereinafter referred to as the "Note" dated as of October 18, 1999 executed by Borrowers and payable to the order of the Mortgagee, with final payment due on January 10, 2001.

**WHEREAS,** the Note is secured by a mortgage of even date therewith being hereinafter referred to as the "Mortgage" executed by the Mortgagor creating a lien on certain real property located in Cook County, Illinois and legally described on Exhibit "A" attached hereto, which Mortgage was recorded with the Recorder of Deeds for said County on November 16, 1999, as document number 09075353 and,

**WHEREAS,** the Borrowers and the Mortgagee desire to modify the terms for the payment of the Note as hereinafter provided.

**NOW, THEREFORE,** in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor and the Mortgagee do hereby agree as follows:

1.      The principal indebtedness evidenced by the Note presently outstanding is Two Hundred Ninety Two Thousand Six Hundred and Ten and 00/100 Dollars ($292,610.00) which shall be paid as follows:

Principal shall be paid in full on October 10, 2001. Accrued interest shall be paid on

1

February 10, 2001 and on the 10th day of each month thereafter until the principal balance shall be paid in full.

NOTE: This is a non-revolving line of credit with a total availability of $506,000.00 which effective this date has only been drawn upon to $292,610.00.

2.    All references in the Mortgage to the Note shall refer to the Note as herein modified.

3.    All references in the Note to the Mortgage shall refer to the Mortgage as herein modified.

4.    Environmental Warranties and Agreements. Mortgagor warrants and represents to, and agrees with, Bank as follows:

(a) The premises, and all operations and activities thereon, are and shall continue to be in compliance with all environmental laws, and the premises are not and shall not become (i) contaminated by, or the site of the disposal or release of, any hazardous substance, (ii) the source of any contamination, by any hazardous substance, of any adjacent property or of any groundwater or surface water, or (iii) the source of any air emission in excess of any legal limit now or hereinafter in effect; and, except as expressly disclosed by Mortgagor to Bank in writing, no asbestos or polychlorinated biphenyls are present or contained in or on the premises.

(b) Mortgagor shall take all actions necessary to investigate, clean up, and eliminate the source of, any past, present or future contamination of the premises by any hazardous substance and to prevent any additional contamination of the premises. The taking of action by Mortgagor under this subparagraph (b) shall not limit any other right or remedy available to Bank by reason of any such contamination (including Bank's right to accelerate payment of the Indebtedness).

(c) For purposes of this Mortgage, (i) "environmental law" means any past, present or future federal, state, local or foreign law, ordinance, rule, regulation or order that regulates or is intended to protect public health or the environment or that establishes liability for the investigation, removal or clean-up of, or damage caused by any environmental contamination, including, without limitation, any law, ordinance, rule, regulation or order that regulates or prescribes requirements for air quality, water quality, or the disposition, transportation or management of waste materials or toxic substances; (ii) "hazardous substance" means any product or waste that is now or hereafter regulated by or subject to any environmental law and any other hazardous substance, pollutant, contaminant or waste, including, without limitation, asbestos and polychlorinated biphenyls; and (iii) property shall be considered to be "contaminated" by a hazardous substance if a hazardous substance is present on or in the property in any amount of level.

5.    The Borrowers hereby restate and reaffirm each and every representation, warrant, covenant and agreement contained in the note and the Mortgage as fully as if such representations, warranties, covenants and agreements were set forth herein.

6.    Except as hereinabove and modified and amended, the Note and Mortgage and all of the terms, conditions and provisions thereof, shall in all respects remain unmodified and

2

D010186921

unchanged and shall continue to serve as evidence of the indebtedness or as security for indebtedness described therein. Without limiting the generality of the foregoing, all provisions of the Note and Mortgage, as respectively amended herein, relating to the defaults in payment of principal, interest or other amounts, with respect to other defaults with respect to obligations of the Borrowers, and with respect to remedies of the Bank, shall continue to be as provided in the Note and the Mortgage, as amended herein, without change or modification.

7.   It is the express intention and agreement of the parties hereto that neither the modification of the Note and  Mortgage or any extension of the maturity or terms thereof as provided aforesaid is intended nor shall be construed as an extinguishment, revocation, satisfaction or discharge of any of the liabilities or obligations under the Note and the Mortgage, or any guaranty thereof. The execution of this Agreement by the Mortgagee shall not be deemed to be a waiver of its rights under any other agreement, note, mortgage, trust deed, security agreement, assignment instrument, guaranty or other document on the part of the Mortgagee in exercising any right nor shall operate as a waiver of such right or any other rights. A waiver and  revocation shall not be construed as a bar or waiver of any right or remedy on any future occasion. All of the Mortgagee's rights and remedies whether evidenced by the Mortgage hereby or by any other agreement, guaranty, mortgage, trust deed, note, security agreement, assignment, instrument or other document shall be cumulative and in addition to all other rights and remedies granted to the  Mortgagee at law or in equity and may be exercised from time to time as often as deemed expedient by the Mortgagee. The obligations of the Borrowers hereunder shall be joint and several.

IN WITNESS WHEREOF, the Mortgagee and Mortgagor have affixed their hands and seals as of the 10th day of January, 2001.

MORTGAGORS:

Chicago Title Land Trust Company, a Corporation of Illinois, as Trustee under Trust Agreement dated April 17, 1997 and known as Trust Number 1103699

SEE ATTACHED EXCULPATORY CLAUSE FOR SIGNATURE

Its: _____

MORTGAGEE:

OLD KENT BANK

By: _____
Robert Girolamo
Its:    Vice President

PREPARED BY & RETURN TO:

OLD KENT BANK
ATTN: Mickey Manos
105 S. YORK STREET
ELMHURST, IL 60126



3

State of Illinois          )
                           ) SS.
County of                  )

I, _____, a Notary Public in and for said County, in the State aforesaid, do hereby
certify that _____, of _____
_____ is/are personally known to me to be the same person(s) whose name(s) are
subscribed to the foregoing instrument as such _____ and _____,
respectively, appeared before me this day in person and acknowledges that _____ signed and
delivered the said instrument as _____ own free and voluntary act of said _____
as aforesaid, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this _____ day of _____, 2001.

_____
Notary Public

State of Illinois          )
                           ) SS.
County of Dupage           ).

I, the undersigned, a Notary Public in and for said County in the State aforesaid, do
hereby certify that Robert Girolamo, Vice President of Old Kent Bank who is personally known to
me to be the same person whose name is subscribed to the foregoing instrument as such Vice
President and he appeared before me this day in person and acknowledged that he signed and
delivered the said instrument as his own free and voluntary act of said bank as aforesaid, for the uses
and purposes therein set forth.

GIVEN under my hand and Notarial Seal this 27th day of February, 2001.

_____
Notary Public

"OFFICIAL SEAL"
Betty Solstad
Notary Public, State of Illinois
My Commission Exp. 03/11/02

4

## EXHIBIT "A"

LOT 126 IN PRAIRIE AVENUE ADDITION TO AUSTIN IN THE SOUTHEAST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PROPERTY COMMONLY KNOWN AS 5900-04 WEST MADISON STREET/10-16 NORTH MAYFIELD, CHICAGO, IL

PERMANENT INDEX NUMBER: 16-08-419-029

UU1U1DD7Z1

EXCULPATORY CLAUSE FOR CHICAGO TITLE LAND TRUST COMPANY, AS TRUSTEE UNDER TRUST 1103699 ATTACHED TO AND MADE A PART OF THE MORTGAGE MODIFICATION DATED JANUARY 10, 2001, TO OLD KENT

It is expressly understood and agreed by and between the parties hereto, anything to the contrary notwithstanding, that each and all of the warranties, indemnities, representations, covenants, undertakings and agreements herein made on the part of the Trustee while in form purporting to be the warranties, indemnities, representations, covenants, undertakings and agreements of said Trustee are nevertheless each and every one of them, made and intended not as personal warranties, indemnities, representations, covenants, undertakings and agreements by the Trustee or for the purpose or with the intention of binding said Trustee personally but are made and intended for the purpose of binding only that portion of the trust property specifically described herein, and this instrument is executed and delivered by said Trustee not in its own right, but solely in the exercise of the powers conferred upon it as such Trustee; and that no personal liability or personal responsibility is assumed by nor shall at any time be asserted or enforceable against CHICAGO TITLE LAND TRUST COMPANY, on account of this instrument or on account of any warranty, indemnity, representation, covenant or agreement of the said Trustee in this instrument contained, either expressed or implied, all such personal liability, if any, being expressly waived and released.

Date: 2/27/01

CHICAGO TITLE LAND TRUST COMPANY, as Trustee
Under Trust No. 1103699

By: _____
Assistant Vice President

Attest:
By: _____
Assistant Secretary

[Corporate Seal: CHICAGO TITLE LAND TRUST COMPANY — CORPORATE SEAL — CHICAGO, ILLINOIS]

State of Illinois
County of Cook        SS.

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that the above named Assistant Vice President and Assistant Secretary of CHICAGO TITLE LAND TRUST COMPANY, personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such Assistant Vice President and Assistant Secretary, respectively, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their own free and voluntary act and as the free and voluntary act of said Company for the uses and purposes therein set forth; and the said Assistant Secretary then and there acknowledged that the said Assistant Secretary, as custodian of the corporate seal of said Company, caused the corporate seal of said Company to be affixed to said instrument as said Assistant Secretary's own free and voluntary act and as the free and voluntary act of said Company for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this

"OFFICIAL SEAL"
COLLEEN KLEIN
Notary Public, State of Illinois
My Commission Expires 2/20/02

_____
NOTARY PUBLIC

Exculpatory Clause w/Notary
Rev 1/97

RECORDATION REQUESTED BY:
**FIFTH THIRD BANK
(CHICAGO) A MICHIGAN
BANKING CORPORATION
101 WEST STEPHENSON
STREET
FREEPORT, IL 61032**

WHEN RECORDED MAIL TO:
**Fifth Third Bank (Chicago), a
Michigan banking corporation
Attn: Commercial Loan
Services
P.O. Box 297 MD# GFPT1A
Freeport, IL 61032**

**FOR RECORDER'S USE ONLY**

This Modification of Mortgage prepared by:            **FIFTH THIRD BANK (CHICAGO) A MICHIGAN BANKING**

**CORPORATION**

**101 WEST STEPHENSON STREET
FREEPORT, IL 61032**

# MODIFICATION OF MORTGAGE

THIS MODIFICATION OF MORTGAGE dated October 10, 2001, is made and executed between CHICAGO TITLE LAND TRUST COMPANY, A CORPORATION OF ILLINOIS, not personally but as Trustee on behalf of TRUST #1103699, whose address is 171 NORTH CLARK STREET, CHICAGO, IL 60601 (referred to below as "Grantor") and FIFTH THIRD BANK (CHICAGO) A MICHIGAN BANKING CORPORATION, whose address is 101 WEST STEPHENSON STREET, FREEPORT, IL 61032 (referred to below as "Lender").

MORTGAGE. Lender and Grantor have entered into a Mortgage dated October 18, 1999 (the "Mortgage") which has been recorded in COOK County, State of Illinois, as follows:

Recorded November 16, 1999 with the Cook County Recorder as document #09075353.

REAL PROPERTY DESCRIPTION. The Mortgage covers the following described real property located in COOK County, State of Illinois:

LOT 126 IN PRAIRIE AVENUE ADDITION TO AUSTIN IN THE SOUTHEAST 1/4 OF SECTION 8 TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

The Real Property or its address is commonly known as 5900-04 WEST MADISON STREET, CHICAGO, IL 60644 & 10-16 NORTH MAYFIELD, CHICAGO, IL 60644. The Real Property tax identification number is 16-08-419-029-0000

MODIFICATION. Lender and Grantor hereby modify the Mortgage as follows:

The purpose of this Modification is to increase the mortgage amount to $660,000.00 and to remove the maturity date.

EXHIBIT
*A*

## MODIFICATION OF MORTGAGE
### (Continued)

CONTINUING VALIDITY. Except as expressly modified above, the terms of the original Mortgage shall remain unchanged and in full force and effect and are legally valid, binding, and enforceable in accordance with their respective terms. Consent by Lender to this Modification does not waive Lender's right to require strict performance of the Mortgage as changed above nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction of the promissory note or other credit agreement secured by the Mortgage (the "Note"). It is the intention of Lender to retain as liable all parties to the Mortgage and all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification. If any person who signed the original Mortgage does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension or modification, but also to all such subsequent actions.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF MORTGAGE AND GRANTOR AGREES TO ITS TERMS. THIS MODIFICATION OF MORTGAGE IS DATED OCTOBER 10, 2001.

**GRANTOR:**

TRUST #1103699 HELD BY CHICAGO TITLE LAND TRUST COMPANY

CHICAGO TITLE LAND TRUST COMPANY, Trustee of TRUST #1103699
HELD BY CHICAGO TITLE LAND TRUST COMPANY

By: _____ _ASST VP_
AUTHORIZED SIGNER, Land Trust Officer of CHICAGO TITLE
LAND TRUST COMPANY

By: _____ _ASST SEC_
AUTHORIZED SIGNER, Land Trust Officer of CHICAGO TITLE
LAND TRUST COMPANY

Signed, acknowledged and delivered in the presence of:

X _____
Witness

X _____
Witness

**LENDER:**

X _____
Authorized Signer

# MODIFICATION OF MORTGAGE
## (Continued)

Page 3

## TRUST ACKNOWLEDGMENT

**STATE OF** _IL_                                    )
                                                     ) SS
**COUNTY OF** _COOK_                                 )

On this _28TH_ day of _NOV_, _2001_ before me, the undersigned Notary Public, personally appeared AUTHORIZED SIGNER, Land Trust Officer and AUTHORIZED SIGNER, Land Trust Officer of CHICAGO TITLE LAND TRUST COMPANY , and known to me to be authorized trustees or agents of the trust that executed the Modification of Mortgage and acknowledged the Modification to be the free and voluntary act and deed of the trust, by authority set forth in the trust documents or, by authority of statute, for the uses and purposes therein mentioned, and on oath stated that they are authorized to execute this Modification and in fact executed the Modification on behalf of the trust.

By _Sheila Davenport_                    Residing at _____

Notary Public in and for the State of _IL_

My commission expires _____

"OFFICIAL SEAL"
SHEILA DAVENPORT
Notary Public, State of Illinois
My Commission Expires 10/7/03

It is expressly understood and agreed by and between the parties hereto, anything to the contrary notwithstanding, that each and all of the warranties, indemnities, representations, covenants, undertakings and agreements herein made on the part of the Trustee while in form purporting to be the warranties, indemnities, representations, covenants, undertakings and agreements of said Trustee are nevertheless each and every one of them, made and intended not as personal warranties, indemnities, representations, covenants, undertakings and agreements by the Trustee or for the purpose or with the intention of binding said Trustee personally but are made and intended for the purpose of binding only that portion of the trust property specifically described herein, and this instrument is executed and delivered by said Trustee not in its own right, but solely in the exercise of the powers conferred upon it as such Trustee; and no personal liability or personal responsibility is assumed by nor shall at any time be asserted or enforceable against the undersigned land trustee, on account of this instrument or on account of any warranty, indemnity, representation, covenant or agreement of the said Trustee in this instrument contained, either expressed or implied, all such personal liability, if any, being expressly waived and released.

# MODIFICATION OF MORTGAGE
## (Continued)

Page 4

## LENDER ACKNOWLEDGMENT

STATE OF _____ )
                                         ) SS
COUNTY OF _____ )

On this _____ day of _____, _____ before me, the undersigned Notary Public, personally appeared _____ and known to me to be the _____ _____, authorized agent for the Lender that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of the said Lender, duly authorized by the Lender through its board of directors or otherwise, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this said instrument and that the seal affixed is the corporate seal of said Lender.

By_____   Residing at _____

Notary Public in and for the State of _____

My commission expires _____

LASER PRO Lending, Ver. 5.13.10.04  Copr. Harland Financial Solutions, Inc. 1997, 2001.  All Rights Reserved.  - IL  K:\CFI\LPL\G201.FC  TR-2062  PR-mortgp1



**ALLIANCE**
FUNDING
*A Division of Superior Bank FSB*

November 3, 1999

Mr. John Gunartt
414 S. Scoville
Oak Park, IL 60302

Dear Mr. Gunartt:

Enclosed is the Forward Commitment for the proposed mortgage on the property located at the referenced address. Please execute two copies of this letter in the space indicated on Page 9 and return both documents with a cashier's or certified check to my attention as soon as possible. The Forward Commitment will not be in effect until payment of the fee as required in Paragraph 2(a) of the Forward Commitment.

Upon receipt of the signed letters and required check, a fully executed copy of this Forward Commitment will be provided to you.

This package contains two execution copies of this letter plus a copy for your file.

Please do not hesitate to contact me with any questions you may have concerning this document.

Very truly yours,

Brian A. McLaughlin
Commercial Loan Manager
Midwest Region

877.320-0009 X 2693

EXHIBIT
B

*For Your Records*

November 8, 1999

John Gunartt
414 S. Scoville
Oak Park, IL 60302

RE:    **Forward Commitment** for a secured commercial loan in the
principal amount of:    **$506,000.00**
        Premises:    **5900-5910 W. Madison
        10-16 N. Mayfield
        Chicago, IL 60644**

Gentlemen:

We are pleased to advise you that your application for a secured commercial loan in the principal amount of **$506,000.00** (the "Loan") has been approved and that **Alliance Funding, a Division of Superior Bank FSB** (the "Lender") agrees to make the Loan to Borrower (as hereinafter defined), subject to the terms and conditions set forth in this Forward Commitment (hereinafter the "Commitment") including the general conditions (the "General Conditions") attached hereto as Exhibit A and incorporated herein by reference and made a part hereof. The Loan shall be (I) evidenced by the Note (as hereinafter defined) and (ii) secured by, among other things, the Mortgage and the other Loan Documents (as each is hereinafter defined).

1.    <u>Borrower</u>. At all times during the term of the Loan, the borrower ("Borrower") shall be **John Gunartt**, an individual. The most recent financial statements of Borrower, (as hereinafter defined) are to be submitted to and approved by the Lender in its sole discretion.

2.    <u>Commitment Fee.</u>

(a)    This Commitment shall be null and void unless the Borrower returns to the Lender a fully executed original of this Commitment. In addition to the executed Commitment, Borrower shall pay the sum of 1 point for a 6 month Commitment or 2 points for a 1 year Commitment. The 6 month or 1 year time period is measured from the date this Commitment is accepted by Lender with the appropriate fee from the Borrower through the date of closing and funding of this transaction. Within one (1) week of the Borrower's receipt of this Commitment, as the fee (the "Commitment Fee") for the issuance of this Commitment and the reservation of funds by Lender on behalf of Borrower hereunder, which Commitment Fee shall be deemed earned upon issuance of this Commitment and shall be **non-refundable** whether or not the transaction contemplated by this Commitment is consummated or this Commitment, by its terms, terminates or expires.

(b) In addition to the above, the Borrower shall pay, upon closing of this loan, any

additional Commitment Fee that is due under the terms of this loan. The amount due shall be **$0.00**.

      3.    <u>Premises</u>. The "Premises" shall consist of the fee simple estate of Borrower in the real property located at **5900-5910 W. Madison and 10-16 N. Mayfield**, **Chicago, Illinois**. The precise metes and bounds legal description of the Premises must be satisfactory to the Lender in its sole discretion.

      4.    <u>Improvements</u>. The Improvements located on the Premises (the "Improvements") consist of **fifteen (15) residential units, three (3) commercial units,** and related site improvements, together with all fixtures and items of personal property owned by Borrower and now or hereafter located therein or thereon. The Premises and the Improvements are hereinafter collectively referred to as the "Property".

      5.    <u>**Principal Amount of the Loan**</u>. **$506,000.00**

      6.    <u>**Loan Closing Date**</u>. The term "Loan Closing Date" shall mean the date upon which the closing of the Loan takes place and the Loan Documents (as hereinafter defined) are executed and delivered to the Lender, which date shall in no event be later than **November 22, 2000** (the "Outside Closing Date"). If the Loan shall fail to close on or before the Outside Closing Date, this Commitment and the obligations of the Lender hereunder shall terminate and expire.

      7.    <u>**Maturity Date**</u>. The entire outstanding principal balance of the Loan, together with all accrued and unpaid interest calculated thereon at the Fixed Rate (as hereinafter defined) or the Variable Rate (as hereinafter defined) whichever is applicable, shall be due and payable in immediately available funds on the "Maturity Date". The "Maturity Date" shall mean the earlier of (a) the Stated Maturity Date or (b) the date upon which the Lender elects to accelerate and declare the indebtedness under the Loan immediately due and payable by reason of a default beyond any applicable notice and/or grace period under, as applicable, the Note, the Mortgage or any of the other Loan Documents.

      8.    <u>**Stated Maturity Date**</u>. The "Stated Maturity Date" shall be **three hundred sixty (360)** months from the first payment due date.

      9.    <u>**Interest Rate**</u>.

      (a)    The unpaid principal balance of the Loan shall bear interest commencing on the Loan Closing Date, until the unpaid principal of the Loan and all accrued interest thereon is paid in full, at a stated fixed rate (the "Fixed Rate") of **twelve and sixty five hundredths (12.65%) percent per annum;**

(c)   <u>Interest Rate After Maturity.</u>   From and after the Maturity Date, the Fixed Rate or the Variable Rate, whichever is applicable, shall automatically be increased to the lesser of (i) twenty-four (24%) percent per annum, or (ii) the maximum interest rate permitted by law to be charged to Borrower. In no event, however, shall the Fixed or Variable Rate exceed a rate which would result in an effective interest rate on the Loan in excess of that permitted by applicable law.

(d)   Interest under the Loan shall be computed on the basis of a 360-day year consisting of 12 months each having 30 days.

10.   <u>Installment Payments.</u>

(a)   An installment of interest only shall be due and payable on the Loan Closing Date on account of interest payable under the Note for the month in which the Loan Closing Date occurs; and

(b)   Equal monthly installments of principal and interest calculated at the Fixed Rate in the amount necessary to amortize the Loan in equal monthly payments over a period of **three hundred sixty (360) months** shall be due and payable commencing on the first day of the second calendar month following the Loan Closing Date and continuing on the first day of each and every calendar month thereafter ensuing until the Maturity Date.

11.   <u>Loan Security</u>. The Loan shall be evidenced by a note (the "Note") in the principal amount of the Loan and secured, inter alia, by a first mortgage lien (the "Mortgage") in the principal amount of the Loan encumbering the Property and an assignment (the "Assignment") of all of Borrower's right, title and interest in and to all rents and leases, any UCC-1 financing statements, any environmental indemnity, and any guaranty pertaining to the Property. The Note will also be secured by a first lien, pursuant to a security agreement (the "Security Agreement") on all of Borrower's right, title and interest in **5900-5910 W. Madison and 10-16 N. Mayfield, Chicago, IL.**   Borrower shall execute and deliver to the Lender such other documents, instruments, and agreements, (collectively, together with the Note, the Mortgage and the Assignment, the "Loan Documents") as the Lender shall require to fully evidence and secure the Loan and to perfect the lien of the Mortgage and any other security for the Loan. All Loan Documents shall be satisfactory in form and content in all respects to the Lender and its counsel, and must contain all provisions the Lender deems necessary or appropriate to document and secure the Loan and to adequately monitor the ownership and operations of the Property and any other security for the Loan.

12.   <u>Leases.</u>

(a)   All leases for all or any portion of the Property shall be subject and subordinate to the lien of the Mortgage. Borrower shall submit all leases to the Lender for its review and approval not later than thirty (30) days prior to the Loan Closing Date.

(b)     Borrower shall deliver a certified rent roll for the Property, in form and substance satisfactory to the Lender in its sole discretion, not later than thirty (30) days prior to the Loan Closing Date.

(c)     Prior to the Loan Closing Date, Borrower shall furnish the Lender with estoppel certificates from all tenants of the Property, if any. Each estoppel certificate shall state, among other matters, that (i) the lease is in full force and effect, (ii) the lease has not been modified or, if modified, listing all modifications thereof, (iii) the tenant thereunder is in possession of the leased premises and is paying all required rental payments without set off, (iv) no rental payments have been made more than one month in advance, (v) any work required to be performed to date by Borrower has been completed to the satisfaction of the tenant, (vi) the term of the lease has commenced and the date of such commencement and date of expiration, (vii) the amount of the security deposit, if any, made by the tenant, (viii) there are no defaults by Borrower under the terms of the lease, and (ix) the tenant thereunder covenants and agrees not to modify, amend, restate and/or cancel the lease without the Lender's prior written consent in each instance.

13.   **Prepayment.**

(a)     Borrower shall not have the right to prepay the Loan in part. Borrower shall have the right to prepay the entire unpaid principal balance of the Loan, at any time upon thirty (30) days prior written notice to the Lender, provided that Borrower pays to the Lender (I) all accrued and unpaid interest and other sums due and payable under the Loan Documents through the date of such prepayment and (ii) a prepayment premium (the "Prepayment Premium") calculated as follows:

(i)     for the period beginning on the Loan Closing Date and ending on the day preceding the first anniversary of the Loan Closing Date, five (5%) percent of the outstanding principal balance of the Loan as of the date of such prepayment;

(ii)     for the period beginning on the first anniversary of the Loan Closing Date and ending on the day preceding the second anniversary of the Loan Closing Date, four (4%) percent of the outstanding principal balance of the Loan as of the date of such prepayment;

(iii)     for the period beginning on the second anniversary of the Loan Closing Date and ending on the day preceding the third anniversary of the Loan Closing Date, three (3%) percent of the outstanding principal balance of the Loan as of the date of such prepayment;

(iv)     for the period beginning on the third anniversary of the Loan Closing Date and ending on the day preceding the fourth anniversary of the Loan Closing Date, two (2%) percent of the outstanding principal balance of the Loan as of the date of such

prepayment;

(v)     for the period beginning on the fourth anniversary of the Loan Closing Date and ending on the day preceding the fifth anniversary of the Loan Closing Date, one (1%) percent of the outstanding principal balance of the Loan as of the date of said prepayment; and

(vi)    for the period beginning on the fifth anniversary of the Loan Closing Date and thereafter there shall not be a Prepayment Premium.

(b)     All sums payable pursuant to this Paragraph 13 shall also be due and payable by Borrower upon demand in the event of any involuntary prepayments or any acceleration of the Loan. In addition, if the Maturity Date occurs as a result of Lender's acceleration of the Loan because of a default by Borrower under any of the Loan Documents and Borrower tenders payment of the Loan indebtedness or any part thereof to the Lender, such tender shall constitute an evasion of the prepayment provisions and shall be deemed to be a voluntary prepayment which shall require the payment by Borrower of any applicable Prepayment Premium required pursuant to this Paragraph 13.

14.     **Guaranties and Indemnities**. On the Loan Closing Date, certain guaranties and indemnities will be executed and delivered to the Lender pursuant to which, among other things:

(a)     **John Gunartt**, the "Borrower", will unconditionally guaranty the prompt payment and performance when due of all obligations of the Borrower under the Loan Documents.

(b)     The Borrower will indemnify and hold the Lender harmless against the payment of any brokerage and/or finders' fees and/or commissions arising in connection with the Loan or any leases, occupancy agreements or licenses entered into from time to time affecting all or any portion of the Property.

(c)     The Borrower will indemnify and hold the Lender harmless against willful misapplication of any security deposits in respect of any leases, occupancy agreements or licenses affecting all or any portion of the Property.

15.     **Taxes; Charges**. All taxes, charges and assessments, special or otherwise, imposed upon or assessed against the Property and all other such charges that are due and payable, including, without limitation, water and sewer rents (collectively, "Charges") must be paid on or before the Loan Closing Date. No exception to coverage or condition as to any such unpaid Charges shall be included in the policy of mortgage title insurance to be issued to the Lender. The Loan Documents shall provide that on the Loan Closing Date and on the first day of each calendar month thereafter, the Borrower shall deposit funds with the Lender in

amounts sufficient to pay and discharge all Charges at least thirty (30) days before the same become due and payable.

16.   **Loan Documents.** The Loan Documents shall provide, among other things, that:

(a)   in the event any payment provided for in the Loan Documents shall be made more than fifteen (15) days after the due date thereof, in addition to its other remedies, the Lender shall be entitled to charge and collect a late charge in an amount equal to **five ($0.05) cents** for each dollar of delinquent payment;

(b)   the placing of any other financing, liens or encumbrances upon the Property, including, without limitation, any mortgages and/or secured transactions under the Uniform Commercial Code, is prohibited;

(c)   the Lender may accelerate the indebtedness evidenced by the Note and secured by the Mortgage in the event of a sale, net leasing or other transfer of the Property or any portion thereof, or in the event of a transfer of any ownership or beneficial interest, direct or indirect, in Borrower (i.e., the transfer of any of Borrower's capital stock, partnership interests, membership interests).

(d)   In addition, the Mortgage will contain provisions pursuant to which the Borrower will agree to indemnify the Lender and affiliated parties against various liabilities, including by way of illustration and not limitation, liability for violations of environmental laws, and related costs and expenses, including attorney and other professional fees; and

17.   **Environmental Laws.**  Borrower shall be and remain personally liable for, and shall indemnify and hold the Lender harmless from, the payment of all costs and expenses associated with the remediation of all Toxic Waste Condition(s) (as hereinafter defined) at or affecting the Property to the extent necessary or required by or under CERCLA, RCRA, and IRPTA (each as hereinafter defined) and all other applicable federal, state or local environmental or health laws, ordinances, rules or regulations (collectively, the "Environmental Laws").  If a Toxic Waste Condition is discovered at the Property prior to the Loan Closing Date, or disclosure required by the IRPTA reveals any Toxic Waste Condition(s), the Lender may cancel this Commitment at any time by sending written notice of such fact to Borrower.  If a Toxic Waste Condition is discovered at the Property subsequent to the Loan Closing Date, Borrower shall, at its sole cost and expense, promptly and diligently remedy such Toxic Waste Condition to the extent required by or under the Environmental Laws.  In addition, upon demand by the Lender, Borrower shall deposit security satisfactory to the Lender in an amount determined by the Lender to be sufficient to ensure the payment in full of the costs of remedying any such Toxic Waste Condition from time to time existing at the Property.  A "Toxic Waste Condition" shall include the presence on the Property of any hazardous substance, including, without limitation, pollutants, dangerous substances, lead

based paint, toxic substances, friable asbestos, hazardous wastes and hazardous substances as defined or set forth in or pursuant to or covered by the Environmental Laws. The obligations referred to in this paragraph (collectively, the "Toxic Waste Obligations") shall survive payment in full of the Loan, the satisfaction or assignment of the Mortgage, and the foreclosure of the Mortgage or acceptance of a deed in lieu thereof. In addition, prior to the Loan Closing Date, Borrower shall provide to the Lender an affidavit of Borrower that Borrower has not been found liable under any of the Environmental Laws nor, to the best of Borrower's knowledge, is it under investigation in respect thereof, and that there have not been any notices, summonses, directives, orders, claims or actions, nor are any pending or, to the best of Borrower's knowledge, threatened, under any of the Environmental Laws, affecting Borrower or the Property or any portion thereof.

For purposes of this Paragraph 17:

(i)     CERCLA means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601, et. seq.), all regulations promulgated thereunder and all amendments, modifications or replacements thereof, now or hereafter enacted;

(ii)     RCRA means the Resource Conservation and Recovery Act (42 U.S.C. Section 6901, et. seq.), all regulations promulgated thereunder and all amendments, modifications or replacements thereof, now or hereafter enacted; and

(iii)     IRPTA means the Illinois Responsible Property Transfer Act (765 ILCS 90/1 et seq.,) all regulations promulgated thereunder and all amendments, modifications or replacements thereof, now or hereafter enacted.

18.     **Special Conditions.**   The Lender's obligation to make the Loan is conditioned upon the receipt and approval by it and its counsel, prior to the Loan Closing Date, of the following:

(a)     All agreements and documents affecting or relating to the Property and the acquisition thereof by Borrower, which agreements and documents shall be in form and content satisfactory to the Lender in its sole discretion.

(b)     Evidence that all applicable governmental and quasi-governmental approvals, certificates, permits, consents and licenses relating to the Property and the use and occupancy thereof have been duly issued and the Property and the use thereof complies with all applicable zoning regulations, rent regulations and building and fire codes.

(c)     A permanent certificate of occupancy for the entire Improvements.

19.     **Acceptance of Commitment.**  This Commitment will become effective only

upon receipt by the Lender not later than ten (10) days from the date hereof at its offices at
One Ramland Road, Orangeburg, NY 10962, Attention: Brian A. McLaughlin,
Commercial Loan Manager, of the enclosed copy of this Commitment executed by Borrower
and accompanied by Borrower's check in the amount of  on account of $5,060.00 (six month)
or $10,120.00 (1 year), the balance of the Commitment Fee which is payable upon Borrower's
acceptance of this Commitment.  If this Commitment is not timely accepted and the above
check is not timely delivered or does not clear on its initial presentation, this Commitment will
be deemed withdrawn and of no force and effect.

20.  **Commercial Loan Purpose.**  The Loan Proceeds are to be used for
commercial purposes.  No portion of the proceeds of the Loan are to be used for any consumer
purpose for the acquisition of goods or services for personal, family or household purposes.

21.  **Additional Stipulations.**  See Exhibit B for additional stipulations required for
closing.  Please note that this is not all inclusive of final stipulations.  Check with the closing
attorney, Samuel M. Einhorn, for completed list.

22.  **Borrower's Acceptance.**  The undersigned Borrower hereby unconditionally
accepts the foregoing Commitment and the attached General Loan Conditions and Special
Conditions, if any, in accordance with their terms and conditions and agrees to be bound
thereby.  The undersigned Borrower further agrees that the Loan which the Lender has agreed
to make in this Commitment will be accepted by the undersigned Borrower on the terms and
conditions set forth therein.  This acceptance shall be deemed effective when received together
with the Commitment Fee, if any, by Lender.

23.  **Charges of Lender's Attorneys.**  As a condition to the closing of the Loan,
Borrower will pay to the Lender on the Loan Closing Date all reasonable fees and expenses of
the Lender's attorneys in connection with the preparation of the Loan Documents, closing of
the Loan and other services provided to the Lender in connection with the Loan.  Such fees
shall be determined by the time spent by the Lender's attorneys and paralegal assistants in
connection with such services at their respective standard hourly rates, and such expenses shall
be reasonable out-of-pocket expenses incurred by such attorneys for duplicating, postage, word
processing, telephone, telefacsimile, express delivery, messenger service, travel and the like.
The Lender presently estimates that the fees and expenses which Borrower will be expected to
pay to the Lender's attorneys for services in connection with the Loan will be approximately $
(To Be Determined).  If at any time it appears that this estimate may be materially exceeded,
the Lender will notify Borrower of the increase at the time the Lender becomes aware of the
increase, but any failure to advise Borrower of the increase shall not affect the validity or
enforceability of this Commitment, the Loan, the Loan Documents or any security for the
Loan.

The fee estimate quoted above assumes:

(a)      that the services to be rendered by Lender's Counsel include (i) the preparation of loan documents; (ii) one round of comments regarding such documents; (iii) the preparation of a second set of documents, if necessary; and (iv) closing of the Loan; and

(b) that Borrower's Counsel shall (i) supply all closing documents required to be delivered by the Borrower or its Counsel, including, but not limited to, title searches, surveys, insurance policies, organizational documents, approvals, and evidence of environmental compliance in a timely manner and (ii) conduct its own investigation into the facts necessary to render the opinion of counsel required hereunder.  To the extent additional drafting, discussion, negotiation or investigation by Lender's Counsel is required, the Borrower shall pay the customary hourly rates of Lender's Counsel for such additional work.

Very Truly Yours,
**Alliance Funding, a Division of Superior Bank FSB**

By:_____
                                                                       (Signature)

Name: **Brian A. McLaughlin**
Title:  **Commercial Loan Manager**

ACCEPTED AND AGREED TO THIS
_____ DAY OF _Novemher 8 1999_
_____
                                                (Signature of Borrower)
**John Gunartt**

BORROWER'S COUNSEL (IF KNOWN):

NAME:_____

ADDRESS:_____

TELEPHONE NUMBER:_____

S:\COMMIT~1\ILLINOIS\GUNARTT.WPD                    9

Nov 17 2003  17:03      P.02

## CONSTRUCTION LOAN ESCROW TRUST AND DISBURSING AGREEMENT

Escrow Trust No.:    D1C  099083033    001

Commitment and/or Policy No.: 1401   007841272   01

ARTICLE I: General Information

A.    Owner/Borrower:

Attorney for Owner/Borrower:

JOHN GUNARTT

414 S. SCOVILLE
OAK PARK, ILLINOIS 60302

(708)383-1288
Fax No.: (708)524-7909

B.    Lender:

Attorney for Lender:

Name:    OLD KENT BANK
Address:

Name:
Address:

105 S YORK ROAD
ELMHURST, ILLINOIS 60126

Contact Person:    LINDA ELWOOD  / BARB BENSHOOF
Telephone No.:    630-941-5442    630-941-2475        Telephone No.:
Fax No.:    (630)941-4365

C.    Escrow Trustee:

Name:  Chicago Title and Trust Company, a corporation of Illinois (hereinafter known as CT&T Co.)
Address:                                Contact Person:    FELICIA WILLIAMS
171 NORTH CLARK                            Telephone No.:    (312) 223-2623
CHICAGO, ILLINOIS  60601

D.    Title Insurer:

Name:  Chicago Title Insurance Company, a corporation of Missouri (hereinafter known as CTIC)
Address:                                Contact Person:    FELICIA WILLIAMS
171 NORTH CLARK, CHICAGO, ILLINOIS  60601        Telephone No.:    (312) 223-2623

E.    Inspector/Architect:    ~~Architectural Lenders~~ Lenders Architectal
        George Hinzs

Contact Person:
Telephone No.: 312-346-2929
Fax No.:

F.    General Contractor:

Name:    JOHN GUNARTT
Address: 414 S. SCOVILLE            Contact Person:
        OAK PARK, ILLINOIS 60302        Telephone No.:    (708)383-1288
                                Fax No.:        (708)524-7909

EXHIBIT
C

G.    Construction Manager:

Name:
Address:                        Contact Person:
                            Telephone No.:
                            Fax No.:

H.    Project Name:    5900 W. MADISON, CHICAGO

Project Location:    5900-04 W MADISON

I.    Cash Deposits:

Amount of Deposits to be made by Lender:                    $506,000.00

Nov 17 2003  17:03 ·                P. 03

ARTICLE 2: Recitals

A.   Owner/Borrower has executed/will execute a mortgage/trust deed encumbering the premises described as follows:

   See Exhibit "A" attached hereto and made a part hereof/Same as those described in CTIC Commitment/Policy No. 1401 007841272 D1

for the purpose of financing, in whole or in part, the construction of or the rehabilitation of improvements thereon (the Project).

For the benefit of the Lender, CTIC has been requested to issue its ALTA Commitment and/or Policy insuring the lien of the mortgage from the consequences of mechanics' liens on an interim basis as construction of the Project progresses; and for the benefit of Lender and Owner/Borrower, CT&T Co. has been requested to provide a disbursing service as a means to pay for construction and related development costs.

At the request of Owner/Borrower, Lender will make periodic cash deposits into this Trust to be disbursed by Escrow Trustee in accordance with the provisions of this Agreement as hereinafter set forth. Said deposits will not be requested more frequently than once per calendar month. Owner/Borrower may also deposit or cause to be deposited funds not constituting mortgage proceeds into this Trust with said funds shall also be disbursed by Escrow Trustee pursuant to provisions of this Agreement.

Owner/Borrower represents and warrants to CT&T Co. that at the date of this Agreement, funds available for construction payment are ample to complete the Project.

B.   The parties hereto agree that Escrow Trustee will disburse Trust deposits made for construction payment to SUB-CONTRACTOR                     . In the event that the General Contractor and any subcontractor jointly authorize the Escrow Trustee to pay any funds due one to the other, the Escrow Trustee may comply with such authorization. However, it is the intention of the parties named herein and signatory hereto that no person not a party signatory to this escrow shall have the right to look to the Escrow Trustee for any disbursement hereunder under a third party beneficiary theory or otherwise, and that the Escrow Trustee owes no duty to any such third party to make any disbursement.

ARTICLE 3: Requirements

A.   Prior to the first disbursement of funds hereunder by Escrow Trustee, the following requirements shall have been satisfied, to wit:

   (1)   The Escrow Trustee shall furnish or shall be prepared to furnish to the Lender, as insured, a Standard ALTA Construction Loan Policy (the Policy), together with CTIC's Standard Interim Mechanics' Lien Endorsement 10A and such other endorsements as set forth hereinafter. If such policy has issued to Lender prior to Escrow Trustee's first disbursement of funds hereunder, then Escrow Trustee shall furnish or be prepared to furnish CTIC Date Down Endorsement 10 and Interim Mechanics; Lien Endorsement 10A covering the requested disbursement.

   (2)   Other endorsements, if any:
      NONE

   (3)   Owner/Borrower shall furnish Lender and Escrow Trustee a Sworn Owner's Statement disclosing the various contracts entered into by the Owner/Borrower relating to the construction of the Project and setting forth the names of the contractors, their addresses, the kind of service, work or materials to be furnished, the amounts of such contracts, the amounts paid to date, if any, the amounts of current payments, if any, and the balances to become due, if any.

   (4)   The Owner/Borrower shall furnish or cause to be furnished to Lender and Escrow Trustee a sworn statement to Owner by the General Contractor setting forth the names and addresses of such persons furnishing labor, service or materials (i. e., subtrades and material suppliers), the kind of labor, service or materials to be furnished, the amounts of the contracts, amounts paid to date, if any, amounts of current payments, if any, and balances to become due, if any.

      LENDER SHALL FURNISH Escrow Trustee the following, to wit:

      (a)   An approval of the conditions of the title as disclosed by the said commitment.

      (b)   An approval for loan disbursement purposes of the Owner's Statement and the sworn statement of the General Contractor.

B.   Prior to each disbursement of funds by Escrow Trustee hereunder, the Owner/Borrower shall furnish or cause to be furnished to Escrow Trustee the following:

   (1)   A current dated Sworn Owner's Statement as described hereinbefore in this Article 3 at A(3);

   (2)   A current dated Sworn Statement to Owner by the General Contractor, as described hereinbefore in this Article 3 at A(4), covering its current construction draw request.

   (3)   Sufficient funds to cover the current disbursement request.

   (4)   Written approval by Owner/Borrower of the payment by Escrow Trustee of the current construction draw(s). In the event that nonconstruction costs are to be paid by Escrow Trustee with Trust funds, then Owner/Borrower shall provide written directions to Escrow Trustee, approved in writing by Lender, setting forth the names and addresses of the payees, the amounts of the respective payments, and the purpose of the payments, i. e., legal fees, real estate taxes, etc.

   (5)   A report by the Inspector or a certification by the Architect certifying that work has been completed and materials are in place as indicated by the current construction draw(s) request approved by the Owner/Borrower.

Nov 17 2003  17:04        P.04

**ARTICLE 4:** General Conditions

A. At any time prior to the commencement of disbursement of funds hereunder, Escrow Trustee shall have the right to notify Lender that CTIC declines any risk offered for insurance under the commitment for title insurance aforesaid. Whereupon Escrow Trustee shall return to the parties any documents and/or funds in Escrow Trustee's possession relating to the Loan.

Where, after the first disbursement of funds by Escrow Trustee, a further title search by CTIC reveals a subsequently arising title matter which gives rise to a title exception over which CTIC is unwilling to insure, Escrow Trustee will notify the Lender and may discontinue disbursement until the exception has been disposed of to the satisfaction of the Lender.

B. If at any time during the course of construction the total of the unpaid disclosed cost of construction, as indicated by the construction column totals on the current dated Sworn Owner's Statement furnished Escrow Trustee pursuant to this Article 3.B(1), exceeds the amount of undisbursed mortgage proceeds as calculated by subtracting the total amount of liability taken on the endorsements provided for at Article 3C from the face amount of the mortgage, the Escrow Trustee need not make further disbursements under the terms of this Agreement until the Owner/Borrower has deposited in this Escrow Trust the sum necessary to make the available funds equal to the unpaid disclosed cost of construction. Also, if Escrow Trustee discovers a misstatement in an affidavit furnished by General Contractor or Owner/Borrower, or any inconsistency or contradiction between or among any figure in the Owner/Borrower's Statement, or the General Contractor's statement or any subcontractor's statement, Escrow Trustee may stop disbursement until the misstatement has been corrected. Escrow Trustee may, at its option, verify information submitted by the Owner/Borrower and the contractors or may require the Owner/Borrower to furnish or cause to be furnished verification of contractor amounts by subcontractors or material suppliers. Should lender know that the total of the unpaid disclosed cost of construction exceeds the amount of the undisbursed mortgage amount as calculated aforesaid, or learn of discrepancies or inaccuracies in the sworn statements or of services, labor or material being furnished but not reflected on the sworn statements, the lender shall notify Escrow Trustee. Escrow Trustee has no liability hereunder to the Owner/Borrower relating to protection against mechanic's lien claims.

C. Prior to the final disbursement of the funds hereunder by Escrow Trustee, it is a requirement of this Agreement that CTIC be prepared to furnish a Standard ALTA Loan Policy covering the date of final disbursement, subject to the usual terms and conditions contained in that form of policy and also subject to exceptions as approved heretofore by Lender, together with the above listed endorsements, if any.

All required documentation must be submitted to Escrow Trustee and approved by CTIC prior to the final disbursement of Trust deposits by Escrow Trustee.

D. The functions and duties assumed by Escrow Trustee include only those described in this Agreement and Escrow Trustee is not obligated to act except in accordance with the terms and conditions of this Agreement. Escrow Trustee does not insure that the building will be completed, nor does it insure that the building, when completed, will be in accordance with plans and specifications, nor that sufficient funds will be available for completion, nor does it make the certifications of the Inspector/Architect its own, nor does it assume any liability for same other than procurement as one of the conditions precedent to each disbursement.

Escrow Trustee has no liability for loss caused by an error in the certification furnished it hereunder as to work in place.

Escrow Trustee shall not be responsible for any loss of documents while such documents are not in its custody. Documents deposited in the United States Mail shall not be construed as being in custody of Escrow Trustee.

In the event of default as declared by the Lender and/or foreclosure of the mortgage by the Lender, Escrow Trustee shall have the right to discontinue further disbursements under this Agreement.

N.B.: Title and construction escrow charges will be billed at the time the first draw request is submitted. Payment is to be made before the second draw request is processed. In the event title and escrow charges are not paid as required, CT&T Co. may terminate this Agreement upon thirty (30) days' written notice to Borrower and Lender.

Owner/Borrower or Lender may direct Escrow Trustee to invest trust deposits; provided, however, that such direction shall be in writing, contain the consent of all other parties to this Escrow Trust, and be accompanied by the taxpayer's identification number and such investment forms as may be required. Escrow Trustee will, upon request, furnish information concerning procedures and fee schedules for investment.

Except as to deposits of funds for which Escrow Trustee has received express written direction concerning investment or other handling, the parties hereto agree that the Escrow Trustee shall be under no duty to invest or reinvest any deposits at any time held by it hereunder; and, further, that Escrow Trustee may commingle such deposits with other deposits or with its own funds in the manner provided for the administration of funds under Section 2-8 of the Illinois Corporate Fiduciary Act (205 ILCS 620/2-8), and may use any part or all such funds for its own benefit without obligation to any party for interest or earnings derived thereby, if any. Provided, however nothing herein shall diminish Escrow Trustee's obligation to apply the full amount of the deposits in accordance with the terms of this Agreement.

In the event the Escrow Trustee is requested to invest deposits hereunder, Chicago Title and Trust Company is not to be held responsible for any loss of principal or interest which may be incurred as a result of making the investments or redeeming said investment for the purposes of this escrow trust.

E. In the event that the Owner/Borrower has engaged the services of a "Construction Manager" in lieu of a "General Contractor", as noted in Article 1 hereof, then all references contained in this Agreement to "General Contractor" are hereby deleted and "Construction Manager" is hereby substituted therefor. In the event that the Owner/Borrower has engaged the services of both a "Construction Manager" and one or more "General Contractors", as noted in Article 1 hereof, then all references contained in this Agreement to "General Contractor" are hereby deleted and the following is hereby substituted therefore: "Construction Manager" and the "General Contractor(s)".

F. The undersigned agree that this Agreement is not intended by any of the undersigned to give any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than Escrow Trustee, Lender, and Owner/Borrower as a third party beneficiary or otherwise under any theory of law.

Nov 17 2003  17:05      P.05

In Witness Whereof, the undersigned have executed this Agreement this 10 day of November , A.D. 1999

Owner/Borrower: JOHN GUNARTT

By: _John Gunartt_

Lender: OLD KENT BANK

By: _____
ROBERT G. GIROLAMO, VICE PRESIDENT

Escrow Trustee: Chicago Title and Trust Company

By: _____
(Authorized Signatory)

The undersigned has received and reviewed the foregoing Agreement and acknowledges that _____ is neither a party to the said Agreement, nor does that Agreement confer any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than Escrow Trustee, Lender, and Owner/Borrower under a third party beneficiary theory or otherwise under any theory of law.

X _____              _____
For the General Contractor                For the Construction Manager

September 20, 1999

Mr. John Gunartt
414 S. Scoville
Oak Park, Illinois 60302

Dear Mr. Gunartt:

It is my pleasure to inform you that the loan committee of Old Kent Bank has approved your loan request on the following terms and conditions:

**Borrower:**               John Gunartt.

**Loan Amount
and Disbursements:**   The Principal amount of the loan will be $506,000.00  Disbursements on the loan are subject to final verification of the cost budget with the contractor's statement.

**Rate:**                   Old Kent Bank Index Rate plus 1.25%, floating, computed on the basis of 360-day year, for the actual number of days elapsed. Interest payments will be due on the 10th day of each month, beginning the month after the initial funding.

**Account:**                A checking account must be established with Old Kent Bank.  The monthly interest payment will be deducted automatically from the account.

**Service Charge:**         $5,060.00 Payable At Closing.

**Term:**                   Maturity Date of loan will be January 10, 2001.

**Security:**               As security for the payment of all indebtedness and obligations of Borrower under the Loan and under all of the documents and instruments which evidence, secure, or otherwise relate to the Loan (the "Loan Documents"). Borrower will grant or cause to be granted to Bank the following security:

(a)    · A first mortgage lien on the two multi unit apartment buildings at 5900-5904 W. Madison and 10-16 N. Mayfield, Chicago, Il. including all improvements, appurtenances, replacements, and additions to the Land, subject only to such title exceptions and encumbrances as are approved in writing by Bank in its sole discretion.



EXHIBIT
D

Gunartt/Commitment Letter
September 20, 1999
Page 2

(b)    If a land trust is used to hold title to the Properties, an assignment
       of beneficial interest in Land Trust holding title to the Land and
       buildings.

(c)    A first priority assignment of all leases, rents and income with
       respect to all or any portion of the Properties.

**Purpose:**            The funds will be used for the rehab of the buildings described above.

**Conditions to**
**Closing:**            Bank shall not be obligated to close the loan until Bank receives in form
                        and substance satisfactory to Bank, all of the following:

(a)    A Certified appraisal that establishes to the satisfaction of the Bank
       that the two properties pledged as collateral will have a
       completed value of not less than $675,000.00

(b)    A Phase I Environmental site assessment of the subject properties
       based on the Phase I assessment Bank in its sole discretion
       determines that further environmental investigation is desirable or
       advisable, a Phase II Environmental site assessment, both
       establishing to the satisfaction of the Bank that the properties are
       environmentally contaminated by hazardous material.

(c)    **Construction Escrow Agreement, Title Insurance Commitment**
       **and Policy.** A construction escrow agreement and a commitment
       for a mortgage loan title insurance policy in the amount of the
       Loan covering all of the real property and fixtures that are part of
       the Facility. That commitment shall be issued by Chicago Title
       and Trust Company and shall be for an ALTA form of mortgage
       loan policy to be issued without standard exceptions and assuring
       that, upon satisfaction of the requirements listed therein, Bank will
       hold a valid first priority mortgage lien on the real property and
       fixtures constituting the Facility. The title commitment must be
       accompanied by complete copies of all documents referred to
       therein as exceptions to or encumbrances on title. Bank reserves